IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| WARREN W. WOODY, | ) |
| Plaintiff, | ) CIVIL ACTION NO. |
| v. | ) 01-AR-1029-M |
| FONTAINE SPECIALIZED, INC., | ) |
| Defendant. | ) |

FILED
02 AUG -6 PM 3:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
AUG 6 2002

## MEMORANDUM OPINION

Before this court is the motion for summary judgment of defendant, Fontaine Specialized, Inc. ("Fontaine"), in this Title VII action brought by plaintiff, Warren W. Woody ("Woody"). Woody complains of racial discrimination in the forms of disparate pay, a hostile work environment, and retaliation for his filing a complaint with the EEOC. Woody has explicitly stated that he is not complaining about working conditions.

### Undisputed Pertinent Facts

Woody, who is black, started working for Fontaine on January 18, 1999 and still works there. On March 30, 2000 Fontaine granted Woody's request to be transferred to the warehouse, where he received the posted "P-2" rate of pay. Initially, Woody and the other warehouse employees rotated through the four warehouse positions of "Cage," "Receiving," "Warehouse," and "Forklift." Before Woody completed his two months in receiving, Fontaine

granted his request to work permanently on the forklift. As a result, Woody never completed his training on the computer in shipping and receiving. All warehouse employees, including the forklift operator, were paid at the P-2 rate until July 1, 2001, when Fontaine raised the warehouse forklift operator pay to the higher "P-3" rate that the material handlers received. Material handlers operate forklifts, but must also have a greater knowledge of the inventory of parts and pre-manufactured items. "Material handlers" are, and at all times relevant to this litigation, have been paid the P-3 rate.

Two white warehouse employees, Sam Jordan ("Jordan") and Kay Peoples ("Peoples"), were paid at the P-3 rate while Woody was paid at the P-2 rate. Jordan had previously worked as a material handler. Peoples had also qualified for a P-3 position, but moved to the warehouse after she was afflicted with carpal tunnel syndrome. Woody briefly worked in the hydraulics department, which pays the P-3 rate, but, because of Woody's admitted inability to do that job, he returned to the warehouse, having never qualified for the job and its P-3 pay.

Chris Knotts ("Knotts"), a white co-employee, referred to Woody as a "colored boy" and uttered one more racial slur, the content of which Woody cannot remember. Soon after the "colored boy" comment, Knotts apologized to Woody. On one occasion, Woody was asked to use his forklift to retrieve axles from an outside

2

storage area while a thunderstorm approached. Woody declined this request without incident. At the same time, a white employee was allowed to bring his much taller machine inside.

## Analysis

Woody seeks to recover under three theories; pay discrimination, hostile work environment, and retaliation. These theories will be examined separately.

## Pay Discrimination

Woody seeks back pay covering the time from when he started as a forklift operator, and was paid the lower P-2 rate until July 1, 2001, when Fontaine equalized the pay of all forklift operators at the higher P-3 rate. Woody is not suing under the Equal Pay Act, but rather under Title VII, charging discrimination in the form of unequal pay. Title VII, therefore, governs this action. As Woody has pointed out, "Title VII incorporates a more relaxed standard of similarity between male and female-occupied jobs, thus plaintiff is not required to meet the exacting standard of substantial equality of positions set forth in the Equal Pay Act." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F 2d 1528, 1529 n. 15 (11th Cir. 1992)(cited in Pl.'s Br. in Opp'n to Summ. J. at 2-3 ).

In order to survive summary judgment on this or any other Title VII action, a plaintiff must show that there is enough

3

evidence to allow a reasonable jury to find that he has satisfied the various elements of a Title VII action. Under the *McDonnell Douglas* burden shifting regimen, Woody must first make a *prima facie* case of discrimination. In *Miranda*, the plaintiff established a *prima facie* case of gender discrimination by "demonstrating that she is female, and that the job she occupied was similar to higher paying jobs occupied by males." *Id.* at 1529. So, to establish a *prima facie* case of race discrimination, Woody must establish that he is black, and that his job was similar to one or more higher paying jobs occupied by white employees. The parties agree that Woody is black. There are actually two alleged differences in pay that Woody relies upon: (1) the difference between "warehouse forklift operator" and "materials handler," (2) and the differences among the "warehouse employees." Both the jobs of warehouse forklift operator and of materials handler primarily involve driving a forklift. This is enough evidence to allow a jury to find that the jobs were "similar." Of course, when comparing pay differences among people who occupy the same job, there is no need to prove similarity. Woody has made his *prima facie* case.

Because Woody has established his *prima facie* case, the burden shifts to Fontaine to articulate one or more legitimate, non-discriminatory reasons for the differences in pay. Fontaine has an explanation for both discrepancies. The first difference is

4

between the forklift operator and the material handler, which Fontaine easily justifies by pointing out that material handlers must know more than their warehouse counterparts. The second disparity Woody complains of is the difference between his pay and the pay of Jordan and Peoples. Fontaine justifies this difference by pointing out that Jordan and Peoples earned a P-3 rate before moving to the warehouse. It is a common, non-racist, practice in American businesses for employers not to lower the wages of an employee who is transferred to a lower paying job classification. Thus, Fontaine has borne its rather low burden of articulating legitimate reasons for its decisions by proffering the fact that material handlers must know about, and deal with, a greater number of parts than warehouse forklift operators, and the fact that Fontaine never lowers the wages of employees who transfer to what would otherwise be lower paying jobs. Fontaine has succeeded in shifting the burden back to Woody, requiring him to show that Fontaine's articulated reasons are pretext.

   Woody does not submit anything in opposition to Fontaine's assertion that materials handlers must know more than the warehouse forklift operators. Instead, Woody attempts to show pretext by suggesting that the reasons Fontaine offers to explain why two white warehouse employees, Jordan and Peoples, earned P-3 pay, and why he did not do not make sense. Woody offers his personal opinion that Fontaine's explanation is bogus. He argues that if

5

Fontaine really had such a policy, he would have received P-3 pay because he was once qualified for a P-3 position. Because it is undisputed that Woody could not master the hydraulics job, and therefore never qualified for it and its P-3 pay, this argument is without colorable merit and does not demonstrate pretext. Woody mounts no other challenge to Fontaine's explanations for the two pay differentials. Since no reasonable jury could find that Fontaine's explanations are pretextual, summary judgment is due to be granted on Woody's pay discrimination claim.

### Hostile Environment

Woody's second complaint is that he endures a hostile work environment. In order to make a *prima facie* case of hostile work environment, Woody must show "(1) the plaintiff belongs to a racial minority; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees of other races more favorably; and (4) she was qualified to do the job." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1310 (11 Cir. 1998). As mentioned, neither party disputes the fact that Woody belongs to a protected group. Fontaine does not deny that Woody is qualified to do his job. Fontaine takes issue, rather, with criteria two and three in *Bessemer Carraway*. Fontaine spends most of its time arguing that the alleged discriminatory conduct does not constitute adverse employment action. The court thinks that

6

defendant could have used its time more productively by pointing out Woody's failure to show a colorable case of hostile environment.

To determine if a reasonable jury could find that Woody was subjected to adverse action, the court must recount all of the indignities visited upon Woody. There was no classic adverse action like demotion or termination. Knotts, a co-worker, uttered two racial slurs aimed at Woody. Knotts referred to Woody as a "colored boy" and uttered some other slur the nature of which no one remembers. Knotts apologized to Woody for the "colored boy" slur. Woody often heard a white co-worker refer to a black co-worker as a "nigger", and heard the black co-worker refer to his white counterpart as "cracker." These two employees were admittedly good friends and often playfully referred to one another using racial epithets. Obviously, neither was much into politically correct speech. They were smiling while offending.

In addition to this language, not uncommon in the workplace, but nevertheless offensive, there is another alleged incident of racial harassment that Woody says constitutes adverse employment action. Woody was asked to use his forklift to retrieve axles from outside the plant while a thunderstorm approached. When he refused, he was told that Fontaine would find someone else to drive the forklift into the storm. Whether someone else, white or black, actually rode into the storm is not reflected in the record.

7

"In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." *Underwood v. Northport Health Services Inc.*, 57 F. Supp 2d. 1289, 1302-03 (M.D. Ala. 1999). The two comments by Knotts are unwelcome, and will be considered as part of the total mix of arguably offensive conduct that Woody was exposed to. Alone, though, they are not enough to satisfy the "severity" requirement. Woody cites *Underwood* for the proposition that "[p]laintiff may have a viable hostile environment claim even if the remarks were not directed at him." (Pl.'s Br. in Opp'n to Summ. J. at 4). In *Underwood*, however, the racial remarks were charged with animus. They were not, as here, the adolescent persiflage of a not unusual workplace friendship between persons of different races. This court believes that while these non animus-charged comments may have been offensive to a third-party listener, they are not *per se* actionable as obvious, animus-charged comments would be. Therefore, while this court does not ignore the remarks, it will accord them less weight than it would had they been charged with racial animus.

The court looks separately at the alleged evidence of racial hostility occasioned by a supervisor's asking Woody to drive his

forklift out of the building and into an impending thunderstorm. Woody balked and was told that he did not have to go outside. He was not punished in any way for insubordination. Instead, the supervisor told Woody that if he chose not to go out, the employer would get someone else to perform the task. Whether anyone else actually performed it is unknown.

The supervisor's statement to Woody can be interpreted in one of two ways. The first is: "It's perfectly acceptable for you to refuse under these circumstances; I can get someone else do it." The second is: "If you do not go outside, we will fire or demote you." Because there is no evidence that shows which of these sentiments was intended, the interpretation of the conversation may be for a jury. Because the matter is before the court on motion for summary judgment, the court must make all reasonable interpretations in favor of Woody. Accordingly, the court finds that, for purposes of summary judgment, Fontaine intended the latter, threatening sentiment. Nevertheless, no matter how interpreted, the conversation was conspicuously not accompanied by any reference to Woody's race, or to anyone else's race. It may have been harshly judgmental, but there is nothing to indicate racial hostility, that is, unless the ordering of a member of a protected class to do something he does not want to do always constitutes proof of hostility toward that protected group, and this court can find no case containing such a holding. There is

9

nothing to indicate that Woody's race had anything to do with the supervisor's decision to have the axles rescued from the storm.

Infrequent, random, offensive racist remarks devoid of animus are not the stuff of actionable workplace harassment. Sending a black employee into an approaching thunderstorm, and threatening to terminate him if he refuses, potentially endangering his life, would call for more careful consideration if there were anything to suggest that the supervisor's order was occasioned by Woody's race. It is not as if Fontaine had a policy of exposing black employees to hazardous working conditions. The "pervasiveness" requirement for a hostile environment claim is simply not present here. *See Harris v. Fanclift Systems, Inc.*, 114 S. Ct. 367 (1993). There may not be enough thunderstorms to test Woody's hopeful hypothesis, if his hypothesis is what this court hypothesizes. This was a single storm incident. What happened cannot be tied together with occasional workplace racial remarks in a way to build an arguable case that Fontaine's higher management intended to create or tolerate an abusive environment for its black employees in general or Woody in particular. If all of the conduct Woody complains of is aggregated, it still does not add up to a hostile racial environment as that term is defined in the cases, and, even if it did, the court will hereinafter show that Fontaine has presented undisputed facts to establish its affirmative defenses.

To reiterate, there is no evidence upon which a fairminded jury could conclude that racial animus motivated Fontaine to say, "drive your forklift out and get the axles." The only evidence on this subject is Woody's own testimony that a white employee, Jeff Franklin ("Franklin"), was permitted to come inside during the storm. Franklin, however, was driving a piece of machinery that was forty feet tall, and was considerably more susceptible to being struck by lightning than a forklift. This disparate treatment, if truly disparate, was rationale and justifiable in context, and, after all, Woody was not even made to go into the storm after he protested. If a jury should decide that Franklin and Woody were treated differently because of their race, it would not be a reasonable jury. Woody simply has not mustered evidence to provide a basis for finding that he was the subject of work environment race discrimination.

Fontaine finally argues that even if Woody has marginally shown that he was a victim of racial harassment, summary judgment should be granted against him because Fontaine has proven the essential elements of the *Faragher/Ellerth* affirmative defense. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998). In order to prevail on this defense, Fontaine must demonstrate that, even if all the evidence is viewed in a light most favorable to Woody, no reasonable jury could find that Fontaine has failed to meet its

burden of proving this defense.

The *Faragher/Ellerth* affirmative defense protects employers who can show that "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998).

The first element has two sub-parts; "prevention" and "correction." Fontaine has proven without doubt that it had an adequate prevention program. It had promulgated and had distributed to its employees a clear anti-harassment policy. The only real dispute is over whether Fontaine can claim the affirmative defense because of Woody's failure to take advantage of corrective opportunities afforded him. Woody did complain to Fontaine, but not about the harassment he complained about here. Rather, he complained about the various incidents that form the basis of his now abandoned "working conditions" claim. Woody never complained about racial epithets. Indeed, on the advice of his lawyer, he refused to discuss the issue with Fontaine.

It is difficult, if not impossible, for an employer to stamp out racial harassment if harassed employees do not report the harassment to the employer. The only other way for the employer to find out about offensive behavior in the workplace is if the

12

offending person confesses. Interestingly, this is what happened in this case. After Knotts, Woody's co-worker, confessed to Fontaine that he had made offensive remarks, Fontaine investigated, and reprimanded Knotts, giving him a final warning, which is further up the progressive discipline ladder than the counseling that he had earlier been given for inappropriate language. Woody disparages this action of Fontaine, complaining that Knotts "only received a final warning" instead of a discharge. The term "final warning" implies that if Knotts transgresses again, he will be fired. Woody did not complain before Knotts was disciplined in the way he was. Once Fontaine began to investigate on its own volition, Woods refused to cooperate. By his refusal to cooperate Woody forfeited any right to complain about the level of the severity of the punishment Knotts received.

Assuming *arguendo* that the claim arising from the forklift incident has viability as disparate treatment, there is evidence that when asked about it, Woody did complain and that he answered the questions posed to him. It may be a close call, but the court believes that Woody was required by *Ellerth/Faragher* to complain about this **before being asked** during an investigation that he did not precipitate. *Ellerth/Faragher* calls for an employee to be pro-active and not simply to react to an employer's inquiry initiated by the employer.

It also occurs to this court that being told to undertake a

dangerous assignment falls into the category of a "working condition," something about which Woody has expressly disclaimed any interest in pursuing.

For the purposes of summary judgment consideration, Woody has failed to take advantage of the corrective opportunities afforded by Fontaine, and has relinquished any claim of being unnecessarily exposed to danger because of his race. If all of the conduct Woody complains of is aggregated, it still does not add up to a hostile racial environment as that term is defined, and, if it does, Fontaine has presented undisputed facts establishing its affirmative defenses. As a result, Fontaine's motion for summary judgment on the hostile environment claim is due to be granted.

### Retaliation

Woody also complains of what he describes as retaliation for his having complained to the EEOC. In order to establish "a prima facie case; the plaintiff must show (1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities." *Couto v. Martin County Board of County Commissioners*, 47 F. 3d 1068, 1074 (11 Cir. 1995). Fontaine concedes that Woody has met the first *Cuito* criterion. Woody argues that an adverse employment action occurred when he received a written reprimand for allegedly sitting down on

14

the job. He says that white employees who committed the same infraction only received an oral reprimand. Fontaine, on the other hand, points to *Davis v. Town of Lake Park*, 245 F 3d. 1232 (11th Cir. 2001), which holds that a warning that does not result in a loss of pay or benefits does not constitute an adverse employment action.

In *Davis*, the Eleventh Circuit specifically noted that a memorandum, unlike the reprimand given to Woody, was not part of the formal discipline process. As a result of Woody's reprimand, he is further up the progressive discipline ladder than he would otherwise be. Theoretically, he has one less opportunity to sit down on the job. The deprivation of an opportunity to sit down while an employee is supposed to be working could qualify as an adverse employment action, but this court finds it so innocuous in the overall scheme of things that it does not satisfy the "adverse employment action" criterion. But, even if it does, Woody has not offered substantial evidence of a causal relationship between his filing with the EEOC and the reprimand. Not only is the temporal separation between the EEOC complaint and the employment action great, but Woody, whom this court must believe on a Rule 56 consideration, has himself testified that his employer is not mistreating him. Indeed, he claims that Fontaine has been extra nice to him since he complained of discrimination, even to the point of allowing him to drive the company truck, something which

Woody believes to be a benefit. In light of what Woody himself says, no reasonable jury could find that Fontaine was motivated to issue this particular written warning by any intent to retaliate. Fontaine's motion for summary judgment is therefore due to be granted on the retaliation claim.

### Conclusion

This court, by separate order, will grant Fontaine's motion for summary judgment.

DONE this ___6th___ day of August, 2002.

                                           _____
                                           WILLIAM M. ACKER, Jr.
                                           UNITED STATES DISTRICT JUDGE